

**HAROLD DWAYNE BURRESS, Plaintiff, v. CITY OF FRANKLIN, TENNESSEE, Defendant.**

**Civil Action No. 3:09-cv-0938**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

*2011 U.S. Dist. LEXIS 92668*

**August 17, 2011, Filed**

**COUNSEL:** [*1] For Harold Dwayne Burress, Plaintiff: Kendra E. Samson, LEAD ATTORNEY, Neal & Harwell, Nashville, TN.

For City of Franklin, Tennessee, Defendant: Brandt M. McMillan, Kristin Ellis Berexa, Farrar & Bates, Nashville, TN.

**JUDGES:** Thomas A. Wiseman, Jr., Senior United States District Judge.

**OPINION BY:** Thomas A. Wiseman, Jr.

**OPINION**

**JURY DEMAND**

**MEMORANDUM OPINION**

In this action, Plaintiff Harold Dwayne Burress asserts claims under the Family Medical Leave Act ("FLMA"), *29 U.S.C. § 2601, et seq.*, the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.* ("ADA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), *42 U.S.C. §2000e, et seq.*, and under *42 U.S.C. § 1983* ("*§ 1983*") for violation of his equal-protection and due-process rights; the plaintiff also asserts state-law claims under the Tennessee Disability Act ("TDA"), *Tenn. Code Ann. § 8-50-103*, the Tennessee Human Rights Act ("THRA"), *Tenn. Code Ann. §4-21-101, et seq.*, and Tennessee common law. (ECF No. 25.) These claims all arise from the defendant's decision to terminate Burress's employment as a Franklin police officer on October 6, 2008. Now before the Court is a Motion for Summary Judgment (ECF No. 33) filed by the defendant, [*2] City of Franklin ("City"), asserting that it is entitled to judgment as a matter of law in its favor regarding Burress's claims against it. This motion has been fully briefed and is ripe for consideration.

As explained below, the City's motion for summary judgment will be granted in part and denied in part. The Court will grant summary judgment in the City's favor on Burress's discrimination claims under the FMLA, Title VII, THRA, and *§ 1983*, and on his due-process and workers-compensation-retaliation claims. The Court, however, finds that material issues of disputed fact preclude summary judgment on the ADA discrimination and retaliation claims, the TDA discrimination claim, and the plaintiff's post-termination retaliation claims. Summary judgment as to those claims will therefore be denied.

**I. INTRODUCTION**

In June 2009, Burress, formerly a police officer employed by the City of Franklin, filed a Charge of Discrimination against the City with the Equal Employment Opportunity Commission ("EEOC") alleging Title VII and ADA violations. Before the conclusion of this EEOC investigation, Burress filed his initial Complaint on October 6, 2009 to ensure that his claims would not be barred by [*3] the statute of limitations. Shortly thereafter, in November 2009, Burress filed an additional Charge of Discrimination with the EEOC alleging retaliation under the ADA and Title VII. While the EEOC continued its investigation, Burress filed his First Amended Complaint on March 16, 2010, and when the EEOC issued Right to Sue letters for both charges, Bur-

ress filed a timely Second Amended Complaint on September 2, 2010. (ECF Nos. 16, 25.)

In his Second Amended Complaint, Burress asserts claims against the City for:

    1. Violations of the notice and benefits provisions of the FMLA;

    2. Termination and failure to accommodate in violation of the ADA;

    3. Termination and failure to accommodate in violation of the TDA;

    4. Retaliatory Discharge under the ADA and TDA;

    5. Retaliatory Discharge for the alleged filing of a workers' compensation claim;

    6. Gender discrimination under Title VII, *§ 1983* and THRA;

    7. Violations of procedural due process under *§ 1983*; and

    8. Post-Termination Retaliation under Title VII, ADA, FMLA, TDA, and THRA, based on the City's withdrawal of a conditional offer of reinstatement.

Following the filing of the Second Amended Complaint, the City filed a motion for summary judgment [*4] in its favor as to all claims.

## II. FACTUAL BACKGROUND

### A. Events Leading up to Plaintiff's Termination

The facts set forth herein are generally undisputed or viewed in the light most favorable to the plaintiff as non-movant, unless otherwise noted.

Before coming to work for the City, Burress served in the U.S. Army and, in 1985, while still in the Army, was involved in a motorcycle crash resulting in a crushed sternum and broken ribs, and placed him in a coma for forty-five days. In addition, Burress suffered substantial damage to the right lobe of his liver. Following this injury, Plaintiff never returned to active duty and was honorably discharged in 1987.

In August 1993, Burress began working for the City's police department as a dispatcher or "communications officer"; in his application, Burress identified himself as a "disabled veteran." (Burress Dep. 67; Harmon Aff. Exh. A) Plaintiff held this position for around eighteen months before going to the police academy and passing the requisite physical and psychological examinations under *Tenn. Code Ann. § 38-6-106* to become a patrol officer. (Burress Dep. 67, 71.) Burress began working as a patrol officer for the City's police department [*5] in 1995. The doctor who administered Burress's physical exam noted that he would need to adopt additional protection to cover the surgical scar over his sternum, which Burress did by wearing a metal plate on top of his Kevlar bulletproof vest. The metal shield fit into a pocket over his sternum.

In August 2002, Burress experienced stroke-like symptoms and went to the Williamson Medical Center ER, where he was seen by a hematologist, Dr. Reid, who informed Burress that he had Hepatitis C, apparently from a blood transfusion, accompanied by hypersplenism and hepatic encephalopathy. Dr. Reid began treating Burress and also referred him to Dr. David Raiford, a transplant surgeon at Vanderbilt, who began treating Burress for his liver problems in October 2002. Dr. Raiford told Burress that he would eventually need a liver transplant, and in 2003 Burress was placed on the liver-transplant waiting list.

In February 2007, Burress began to experience symptoms related to his hepatic encephalopathy [1] that caused behavioral changes. In particular, Burress had an incident at the Human Resources ("HR") Department in which he became upset and angry with HR Director Shirley Harmon because Burress felt [*6] that he had been passed over for promotion despite having tested for the promotion and having been placed on the promotional list. Although Burress does not believe that he was disrespectful, he does admit that he upset Harmon and that his own behavior surprised him. Chief of Police Jackie Moore witnessed part of this incident and told Burress to return to the police department; Chief Moore noted that the plaintiff's actions were aggressive, erratic, and out-of-character. Although the lack of promotion that angered Burress in that instance is not at issue in this case, the defendant asserts that the episode is relevant. (Def.'s Brief at 3.)

---

    1  Hepatic encephalopathy is the medical term used to describe impairments in brain function caused by the failure of the liver to perform its normal functions. Symptoms of hepatic encephalopathy vary widely from behavioral changes or sleep disturbances to unresponsiveness or coma. (Raiford Dep. 18-20.)

Following this incident, Deputy Chief Sanders and Sergeant Ray Dilworth met with Burress on March 7, 2007 and gave him an employee counseling/warning record. (Harmon Aff., Collective Exh. B.) Deputy Chief Sanders told Burress that he was recommending [*7] a

four-day suspension based on the February HR episode. Further, Burress learned that the Accident Review Committee recommended a one-day suspension because of Burress's involvement in a motor vehicle accident in December 2006. During this conversation, Burress became irritated and frustrated with Deputy Chief Sanders, and after leaving Sanders's office, Burress began crying. Sgt. Dilworth offered to take Burress home, and after the two of them left the police station, Burress removed his gun from its holster, unloaded it, and handed it to a surprised Sgt. Dilworth, telling him "it would be a good idea for you to hold my weapon" and that he was "not having good thoughts." (Burress Dep. 129--32; Harmon Aff. Exh. C, transcript of Disciplinary Hearing, 11.) Burress states that he was not thinking clearly at the time; Burress, however, also contests Sgt. Dilworth's version of the events; in particular, he contends that Sgt. Dilworth overreacted and that Sgt. Dilworth has a tendency to overreact. (Burress Dep. 130--33; Harmon Aff. Exh. C, transcript of Disciplinary Hearing, 10--11.) Burress attributes this entire episode to his hepatic encephalopathy. (Burress Dep. 139, 152.)

After this March [*8] 7, 2007 incident, Chief Moore placed Burress on administrative leave and barred him from returning to work until he underwent physical and psychological fit-for-duty exams. (Burress Dep. 135--36; Moore Dep. 20--22.) Burress passed both of these exams, but the psychological examiner, Dr. Les Hutchinson, stipulated that Burress ought to closely monitor his liver condition with his two physicians, Drs. Reid and Raiford, and that he should begin regular counseling sessions for depression, anger, negative feelings, and post-traumatic stress disorder. (Hutchinson Dep. 45 & Exh. 2.) Dr. Hutchison noted that Burress was taking Effexor, an antidepressant, and the plaintiff admits to taking Effexor but stated that he was unsure of what condition it treated. (Burress Dep. 141; Hutchinson Dep. 45.)

Police officers are required by law to receive new ballistic vests every five years, and in the summer of 2007, Burress was provided with a new vest. (Burress Dep. 162--63.) This new vest irritated the surgical scar from his 1985 motorcycle accident. Also during the summer of 2007, Burress was called for a liver transplant, but because of the open wound on his chest caused by the ballistic vest rubbing [*9] against his surgical scar, his doctors told him they were unable to perform the surgery at that time. Burress's doctors ordered him not to wear the vest for a period of time; as a result, Burress was required to go on light duty. (*Id.* at 162--65.)

Around this time, Burress also went to Barry Baird, the City's risk manager, to report the injury caused by the new bulletproof vest rubbing on the old surgical scar. Baird was unsure if worker's compensation would "deal with" this type of injury but told Burress he would go ahead and "file it" and "see what happens." (Burress Dep. 165.) The parties agree that a First Report of Injury was created, but there is a dispute as to whether this claim was ever processed. (Burress Dep. 166--71, 194; Harmon Aff. Exh. E; Def.'s Brief at 6.) Regardless, because of his issues with his new ballistic vest, Burress requested a light-duty assignment. The request was granted, and he was assigned to guard the police impound lot in September 2007. (Burress Dep. 171, 181; Burress Dep. Exh. 25.)

On November 5, 2007, Burress underwent a skin graft to repair the wound on his chest. Although he was not out of work for very long recovering from that surgery, Burress [*10] ran out of paid sick-leave days on November 5, 2007. He requested donated sick-leave days. The City permits employees to donate their unused sick-leave time to other employees: Employees may request this donated time and are eligible to receive up to eighty days of donated sick leave. (Harmon Aff. ¶ 7.) As Burress had used all of his sick leave, records from Ginger Martin, who was then the City's Insurance/Benefits Administrator, indicate that Burress was sent an FMLA packet on November 8, 2007, which was completed. (Martin Dep. 16.)[2] Burress contends that he never received this packet in the mail, but instead signed it in Ms. Martin's office. (Burress Dep. 196--200.) Burress further asserts that he did not know what the FMLA was, believed that he was signing a release to allow the City access to his medical records, and that he most likely did not read the paperwork as he signed it. (*Id.*) Dr. Raiford's office also signed this form, but Burress is unsure whether he or the City's HR department secured this signature. (Burress Dep. 200--02, Exh. 27.)

> 2 These records also indicate that the City had previously mailed FMLA paperwork to Burress on August 9, 2007 and that this paperwork went [*11] unreturned. (Martin Dep. 15.)

In any event, after a brief recovery period following his skin graft surgery, Burress returned to work in another light-duty position as a crisis negotiator. By January 2008, as Burress continued to perform light-duty work for the City, his liver condition began affecting him more: He was fatigued, and his physical condition was deteriorating. (Burress Dep. 206.) On February 6, 2008, Burress experienced another episode apparently caused by hepatic encephalopathy, left work and, did not return. When this episode occurred, Burress had been working at his desk without taking any breaks and had become confused about the time of day. Sergeant Simpkins came by to check on him and explained to Burress that he was concerned about Burress's well-being. Burress brushed off Simpkins' fears saying that he was just overworking

himself. Sgt. Simpkins told Burress he would be right back; he left and returned with Lieutenant Escobar. According to the two officers, Burress was confused, agitated, and acting in a way that was wholly out of character. (Escobar Dep. 9--11; Simpkins Dep. 9--10.) The two men proceeded to explain that they were concerned about Burress's safety [*12] and mental health and, fearing an incident similar to the one with Sgt. Dilworth, they asked Burress to hand over his weapon. These officers also insisted that Burress remain in his office until June McHenry, a counselor that Burress requested, could come speak to him. (Burress Dep. 215--16; Escobar Dep. 9--12; Simpkins Dep. 9--12.) Burress's memories of this entire incident are hazy at best, and he has no memory of requesting or meeting with Ms. McHenry that day. (Burress Dep. 216.) Sgt. Simpkins drove Burress home after he had spent some time in the training room of the police station talking with McHenry. (Burress Dep. 216; Simpkins Dep. 11--12.)

February 6, 2008, the day of this incident, was the last day Burress came to work for City. The City's next contact with Burress was when Chief Moore told Burress that the department had scheduled a fit-for-duty exam for him. After meeting with his treating physicians, Burress opted not to go to this examination because it was to be performed by a psychologist, and both Burress and his doctors agreed that his issues were medical rather than psychological. (*Id.* at 220--21.) Burress and his doctors also discussed whether he could return to work, [*13] and his doctors told Burress to wait until his liver transplant; Burress acknowledged during his deposition that he could not have gone back to work as a patrol officer during that time frame. (Burress Dep. 222.)

From February 12, 2008 through April 17, 2008, Plaintiff received a salary through donated sick leave from other officers, and from April 17, 2008 until his termination on October 6, 2008, Plaintiff was on unpaid leave. (City's Responses to Pl.'s Interrogatories, No. 15.) During these twenty-four weeks of unpaid leave, Burress received long-term disability benefits through a policy provided by the City, which paid approximately $1,700 monthly, and also received $2,700 monthly through Army retirement payments and Social Security Disability benefits. (Burress Dep. 245--47.) Although it was not required to do so, the City paid Burress's health insurance premiums throughout this period of unpaid leave. (Harmon Aff. ¶ 9.)

Between Burress's departure in February 2008 and his liver transplant in August 2008, Burress remained in contact with Deputy Chief Rahinsky and HR Director Harmon to keep them apprised of his medical status. Burress does not recall any exact dates of these conversations [*14] but claims that during these conversations Harmon intimated to him that his job was secure and that the City paid his health insurance premiums because he was still an employee. Similarly, Rahinsky allegedly told Burress he would continue to have a job in the police department. Burress emphasizes that Rahinsky never expressed any concerns about the amount of time Burress had missed or would be missing because of his medical problems. (Burress Aff. ¶ 6.)

Burress finally received a liver transplant on August 12, 2008. Following the surgery, Plaintiff remained in the hospital for a week before being discharged on August 19, 2008. His activities were severely restricted immediately following the surgery. On September 25, 2008, Burress had a follow-up appointment with his transplant surgeon, Dr. Kelly, at which time he requested that he be released for light-duty work and allowed to drive. Dr. Kelly released Burress to drive but opted to wait until the next follow-up appointment to assess Burress' ability to return to work.

In late September 2008, Burress went to the City's HR Department and spoke with HR Director Harmon.[3] Burress told Harmon that he had an upcoming doctor's appointment [*15] on October 16 and that he expected to be released for light-duty work following that visit. He informed Harmon that when he returned to work he would need to be in a light-duty position for up to a year. Burress also explained that he planned to have another elective surgery in the future to repair an abdominal-wall defect unrelated to his transplant. According to Burress, he told Harmon that he did not expect to miss much work for that surgery, and he intended to work long enough to accumulate sufficient sick leave prior to taking additional time off to undergo that surgery. (Burress Aff. ¶ 5; Kelly Dep. 43--44.) Burress insists that no one from the City expressed any concerns about his planned return to work either during this conversation or in any of his previous conversations with Deputy Chief Rahinsky. (Burress Aff. ¶ 7.)

> 3   Burress's recollection of this meeting differs from that of Harmon and other City employees who overheard their conversation, but the Court must of course accept Burress's version of events for the purposes of the City's summary judgment motion.

After this September meeting between Burress and HR, the City purportedly realized that Burress had been on unpaid leave [*16] for six months--two months longer than the four months allotted in the HR Manual. On October 6, 2008, Russell Truell, Acting City Administrator, signed a letter terminating Burress's employment, allegedly because Burress was unable to return to his full-time position after exhausting both his twelve weeks of FMLA leave and his additional twelve weeks of unpaid leave. (Harmon Dep. 99; Truell Dep. 13--16;

Exh. 19.) Although Burress had already been on unpaid leave for six weeks longer than permitted by the City's policy, Harmon conceded in her deposition that allowing Burress to take additional unpaid leave would not have imposed any undue hardship on the City. (Harmon Dep. 184--85.) Truell's October 6, 2008 letter also stated that Burress was disabled and unable to return to work. (Truell Dep. 13--16, Exh. 19.) While the decision to terminate Burress ultimately rested with Mr. Truell, Truell did not discuss Burress's termination with anyone prior to making this decision and did not investigate whether Burress could have been placed in another position. (*Id.*) Further, Truell did not actually draft his October 6, 2008 letter terminating Burress, and he cannot remember who did. (*Id.*)

On October [*17] 6, 2008, Burress was called to a meeting with Chief Moore and Deputy Chief Rahinsky. (Burress Aff. ¶ 8; Burress Dep. 259--60.) In this meeting, Chief Moore gave Truell's letter to Burress and told him he was fired. (Burress Dep. 260.) Burress told Moore that he had an upcoming doctor's appointment and that he expected to be able to return to light duty within just a couple of weeks, but Moore told Burress that he was not obligated to give Burress a light-duty job. Burress also reminded Rahinsky about his statements that Burress's job was safe; Rahinsky did not deny making these statements and responded that "they must have told you that so you would survive your surgery." (*Id.* at 260--61.) After his termination, Burress hired attorney Mark Mayhew to meet with the City about his termination. (Burress Dep. 263; Truell Dep. 14--15.)

**B. After Plaintiff's Termination**

On October 16, 2008, Burress had his next follow-up visit with his surgeon, Dr. Kelly. Following this appointment, Dr. Kelly wrote a letter regarding Burress' health status, stating that "over the next four to six weeks" Burress could "transition to all duties that he was performing prior to his transplant" and that the hepatic [*18] encephalopathy that plagued Burress in 2007 and 2008 was wholly resolved by the liver transplant. (Kelly Dep. 40--46, Exh. 9, 10.) The City, however, contends that this letter provided inadequate information because it did not explicitly clear Burress for light-duty work and it further indicated that Burress was still restricted from wearing a ballistic vest. (Harmon Dep. Ex. 22; Def.'s Brief at 9.) The City, however, did not contact Dr. Kelly or Burress for further information or clarification regarding Burress's limitations.

In response to Dr. Kelly's October 16, 2008 letter, Harmon wrote Burress a letter dated October 21, 2008 emphasizing her opinion that Burress clearly could not return to work. (Harmon Aff. Exh. I.) In response, Burress's then-attorney, Mark Mayhew, sent the City a copy of another letter from Dr. Kelly, this one dated October 28, 2008. This letter provided "full medical clearance" for Burress to return to work but restricted him from lifting more than twenty pounds until after November 12, 2008 (three months post-transplant), and from being in a small, poorly ventilated area with a large number of people or engaging in physical combat. (Kelly Dep. 47--50, Exh. 10.) [*19] The letter did not indicate when the latter two restrictions would be lifted, but did state that after November 12, Burress's immunosuppressive medications would be decreased, his immune system would be more active, and the restrictions would be "further lifted." (*Id.*) Dr. Kelly explained in his deposition that the requirement that Burress avoid confined, unventilated areas was designed to prevent Burress from being exposed to persons of unknown medical status such as strangers on an airplane and would not have prevented him from working in an enclosed room with people whom he knew. (*Id.* at 50, 60.) Dr. Kelly also mentioned in his letter that Burress was scheduled for an abdominal wall surgery repair in January 2009, after which he would have a five-pound lifting restriction for six weeks. Burress maintains that the abdominal-wall surgery was voluntary, and would not necessarily have had to take place in January 2009.

In a letter dated November 4, 2008, Acting City Administrator Truell informed Burress that, in the City's opinion, Dr. Kelly's October 28, 2008 letter was not a full release to return to work and that Burress was not able to perform the functions of a police officer based [*20] on the restrictions imposed by Dr. Kelly. (Truell Dep. 27, Exh. 26.) Truell also informed Burress that no light-duty positions were available, that Burress's previous light-duty position had been eliminated, and that his upcoming abdominal-wall surgery would place additional restrictions on Burress and require him to be on light duty for longer than the thirty-day maximum allotted by the City's Return-to-Work Policy. (Truell Dep. 27--30, Exh. 26.) Truell also noted in his letter that he understood Burress had been working for a karaoke business in violation of City's HR Manual Rule XVI, § 9.5, which prohibits employees on leave from working for any other employer unless that work is specifically approved by the City Administrator. (Truell Dep. Exh. 26.)

In his response to the City's motion for summary judgment, Burress points out that despite Truell's statements in his November 4, 2008 letter that Burress was being terminated for working another job in violation of City policy--a position echoed in the City's responses to the plaintiff EEOC discrimination charge--the City now denies that this factored into the plaintiff's discharge. (Pl.'s Resp. at 8; ECF No. 60, Def.'s Resp. Interrog. [*21] No. 7--8; Harmon Dep. Exh. 29; Truell Dep. Exh.

26.) Further, Burress asserts that the City's return-to-work policy would have permitted him to return to work in a modified-duty position and that Burress had requested such a position both before his transplant and when he spoke to Harmon in September 2008. (Burress Dep. 253--55; Harmon Dep. Exh. 27.) Burress presents evidence indicating that the City did not actually investigate whether there were any available light-duty positions in the police department. Specifically, it appears that Truell did not investigate whether there were any light-duty positions available or whether Burress's prior light-duty position had been eliminated before he sent his letter. (Truell Dep. 27--30.) Burress contends that, contrary to Truell's claims that the state of the economy caused a dearth of light-duty work, existing employees were being juggled to fill empty light-duty positions (Pl.'s Resp. at 7; Truell Dep. 30), and that the light-duty position Burress had previously held had not been eliminated. (ECF No. 60 ("Pl.'s Resp.") 7; Moore Dep. 47--48; Simpkins Dep. 22; Truell Dep. 27--30 and Exh. 26.)

In addition, Burress alleges that at the time he was [*22] terminated, the City had openings for communications officers; Burress had experience working as a communications officer since he served in that position when he first began working for the police department in 1993. The City does not dispute that Burress was qualified for this position but alleges that Burress's temporary restrictions prevented him from being able to work as a communications officer: In particular, the City contends that Burress was unable to lift or carry weights of twenty to forty pounds as required in the job description and unable to work in a windowless room with the other communications officers because of his confinement restrictions. (Def.'s Brief at 29; Def.'s Resp. Interrog. No. 4.) Burress counters this assertion by pointing out that (1) those restrictions were temporary and were going to be lifted soon; (2) the confinement restriction was not applicable in this instance anyway, as the City would have discovered if it had asked Burress or Dr. Kelly about that restriction; and (3) the lifting requirement set forth in the job description was not accurate, as evidenced by the fact that (a) Janet Wohler--who had served as a communications officer for eleven [*23] years--had never lifted more than a few pounds and certainly never weights of twenty to forty pounds; (b) Burress himself had never lifted twenty or more pounds when he was working as a communications officer; and (c) the City's own advertisement for the position made no mention of such a lifting requirement. (Burress Aff. ¶ 3; Pl.'s Resp. at 9; Wohler Declaration ¶¶ 2--3, 5--6.)

In April 2009, the plaintiff retained his current attorney, Kendra Samson, to represent him in pursuing legal action against the City. Samson and Shauna Billingsley, the City Attorney, exchanged several letters regarding the possibility of a settlement, and on September 4, 2009, Samson made a settlement demand on the City through Billingsley. (ECF No. 48-2, 1-4.) In response, the City offered to reinstate the plaintiff--conditioned upon his successfully completing several tasks including passing psychological and physical examinations--but refused to consider any payment for damages. (*Id.* at 5--9.) After some negotiation to clarify that the City did not consider reinstatement as a resolution of the plaintiff's damages claims against the City, Burress agreed to reinstatement with the conditions imposed by the City. [*24] (*Id.* at 11--12; Harmon Dep. Ex. 35.)

On October 2, 2009, psychologist Dr. Scott J. Gale conducted Burress's psychological examination. (Gale Dep. 5--6, Ex. 5.) This examination consisted of a standard pre-employment screening designed to certify that Burress was free of "all apparent mental disorders that may impact [his] ability to perform [his] job safely." (*Id.*) Under penalty of perjury, Dr. Gale confirmed that Burress was qualified pursuant to the Tennessee Peace Officer Standards and Training Commission. On October 6, 2009, the plaintiff filed his initial complaint, and the defendant was served through personal service on Shauna Billingsley on October 7, 2009. (ECF Nos. 1, 4.)

After receiving Dr. Gale's psychological examination results for Burress, Chief Moore called Dr. Gale and asked him to reconsider his assessment, but Dr. Gale declined to do so. (Gale Dep. 11--12.) Chief Moore informed Dr. Gale that the City Attorney would call him. The City's Attorney called Dr. Gale echoing Chief Moore's request that he reconsider his assessment of Burress's ability to safely perform the duties of a police officer. (*Id.* at 12--14.) According to Dr. Gale, the City Attorney emphasized that Burress [*25] "was really apparently not wanted back at the department" and that the City wanted Dr. Gale to "see him again to review his [Dr. Gale's] findings." (*Id.* at 14--15.) Dr. Gale again declined to pursue additional testing or to amend his report and suggested that Defendant hire another psychologist. (*Id.*) The City Attorney, presumably Ms. Billingsley,[4] called Dr. Gale twice, and on October 26, 2009, Dr. Gale emailed a blank personal history questionnaire form--the same form that Burress had been required to complete as a part of Dr. Gale's analysis--to Billingsley. (*Id.* at 23--24, Exh. 2, Exh. 5.) Since his examination of Burress, Dr. Gale has not performed any other evaluations for the City. (*Id.* at 7.)

---

4   Dr. Gale could not remember who called him but stated that the name Shauna Billingsley sounded familiar and may have been the person who called. (Gale Dep. 13.)

On October 16, 2009, Billingsley sent a letter to the plaintiff's attorney stating that the City had reviewed Burress's psychological evaluation and had noted discrepancies between what Burress had stated therein and what the City knew to be true. (ECF No. 48-2, 13.) After Burress's attorney responded on October 22, 2009, Billingsley [*26] sent a letter on November 5, 2009 withdrawing the plaintiff's job offer and explaining that this withdrawal was induced by his alleged repeated dishonesty--particularly during his psychological evaluation. (*Id.* at 14--17.) This letter stated that the City had contacted Dr. Gale and that the plaintiff's account of what he said to Dr. Gale was not congruent with Dr. Gale's memories of the examination; Dr. Gale, however, does not remember ever telling the City that his memory of the examination differed from Burress' account. (ECF No. 48-2, 16; Gale Dep. 55, 60--61.)

The City's primary issues with Burress's statements to Dr. Gale regard his statements about prior psychological counseling and whether Burress had ever taken Valium or "similar drugs" before. (ECF No. 48-2, 14--17.) The City claims that Burress had previously seen counselor June McHenry through the City's Employee Assistance Program but did not disclose this relationship to Dr. Gale. (*Id.* at 17.) Burress counters that he and Ms. McHenry never had a therapeutic relationship and that instead their interactions were limited to work-assignment situations, what Ms. McHenry refers to as "mini-assessments," such as determining fitness [*27] for duty. (McHenry Dep. 13--15, 19.) The City also contends that Burress took Effexor for a period of time before his surgery but failed to disclose this fact when asked whether he had ever taken Valium or "similar drugs." Burress, however, asserts that this omission is wholly irrelevant because, as Dr. Gale later confirmed, Effexor, an antidepressant, would not necessarily be considered "similar" to Valium. Dr. Gale also indicated that, even if Effexor could be considered similar to Valium, this purported non-disclosure would not have been material given that Burress had not taken Effexor for over a year at the time of Dr. Gale's evaluation and was not sure of its purpose when he was taking it to. (Burress Dep. 41; Gale Dep. 46--47, 59--60; Pl.'s Resp. at 13.)

### III. STANDARD OF REVIEW

Under *Rule 56(a)*, before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. The Court may conclude that no genuine issue for trial exists only if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*

[*28] The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Once the moving party satisfies this burden, the non-moving party thereafter must produce evidence demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247--48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* To avoid usurping the role of the factfinder, the Court must accept as true the non-moving party's evidence and construe all justifiable inferences that may be drawn therefrom in favor of the non-movant. *Id. at 255.* The Court may not make credibility determinations nor weigh the evidence before it to determine whether an issue of fact remains for trial. *Logan v. Denny's, Inc., 259 F.3d 558, 566 (6th Cir. 2001).*

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant is required to do more than simply show there is some "metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586.* The rule requires the non-moving party to present specific evidence showing that a genuine [*29] factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Fed. R. Civ. P. 56(c)(1).* Indeed, the non-moving party cannot simply rest on its pleadings, and instead must produce probative evidence to support its claim. *Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994)* (citing *Celotex, 477 U.S. at 324*.). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson, 477 U.S. at 252.* If the disputed evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at 249--50.*

### IV. ANALYSIS AND DISCUSSION

**A. Plaintiff's Unsupported Claims**

The City has moved for summary judgment as to all of Burress's claims, specifically including the discrimination claims brought under the FMLA, Title VII, the THRA, and *§ 1983* (based on violation of the *Equal Protection Clause*), as well as the claim for retaliation for filing a workers' compensation claim. In his response in opposition [*30] to summary judgment, the plaintiff does not present any argument in support of those claims and fails to point to any material disputed facts relevant to those claims. The defendant's Reply notes the plaintiff's failure to raise arguments in support those claims and construes it to mean that the plaintiff concedes these

claims. (ECF No. 67 ("Def.'s Reply").) The plaintiff's Surreply again makes no mention of these claims--failing either to expressly concede the claims or to present arguments and evidence in support of them. (ECF No. 73 ("Pl.'s Surreply").)

The plaintiff's leaving these claims wholly unaddressed and unsupported leads the Court to conclude that the plaintiff no longer wishes to pursue them. Moreover, even if the plaintiff did intend to pursue these claims, as they stand, there is an absence of evidence sufficient to support them. Therefore, the Court will grant the City's motion for summary judgment as to Burress's claims of discrimination under the FMLA, Title VII, the THRA, and *§ 1983*, and as to his claim of workers-compensation retaliation.

In addition, although the plaintiff does not address the defendant's arguments pertaining to his due-process claim under *§ 1983* [*31] either, it is clear that the defendant has abandoned any intention to rely upon the plaintiff's alleged violation of City policy as a basis for the plaintiff's discharge, which obviates the basis for the plaintiff's due-process claim. In his response brief, the plaintiff acknowledges the defendant's abandonment of that position but does not raise any argument or present any factual disputes regarding his due-process claim. The Court will therefore dismiss this claim as well on the grounds that the plaintiff has apparently abandoned it and because there is insufficient evidence to support it.

**B. Plaintiff's ADA Claims**

**1. Discrimination under the ADA**

In his Second Amended Complaint, the plaintiff alleges that the defendant violated the Americans with Disabilities Act, *42 U.S.C. § 12101, et seq.*, [5] by, in essence, denying him a reasonable accommodation and terminating him because of his disability. (ECF No. 25.) The City argues that Burress fails to present a *prima facie* ADA claim because (1) Burress was not a "qualified individual" within the meaning of the ADA; (2) the City did not refuse to make a reasonable accommodation because no reasonable accommodation existed; and (3) the City did [*32] not terminate Burress solely because of his disability. (Def.'s Brief at 25.)

> 5   As a threshold matter, the Court notes that the ADA was amended by the ADA Amendments Act of 2008, which went into effect on January 1, 2009. Burress's lawsuit was filed in October 2009, after the Amendments were enacted, but the events giving rise to his ADA claim all took place in 2008. The Sixth Circuit, like most other courts to consider the question, has held that the ADA Amendments Act does not apply retroactively to actions that took place before the law took effect. *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009).

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. The ADA's definition of "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or [*33] an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* at *§ 12112(b)(5)(A)*.

An employee may prove discrimination based on disability in two ways. The first is by putting forward direct evidence that the defendant had a discriminatory motive in carrying out its employment decision. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citation omitted). As the Sixth Circuit has described it, direct evidence might "take the form, for example, of an employer telling an employee, "I fired you because you are disabled." *Id.* Courts recognize that direct evidence of a discriminatory animus is rare, so employees may also prove discrimination through the indirect burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802--03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Under the indirect-evidence method, the employee must first establish a *prima facie* case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996). The employee may establish a *prima facie* case of discrimination by showing that (1) he is disabled within the meaning of the ADA; [*34] (2) he is "otherwise qualified" to perform the job in question with or without a reasonable accommodation; and (3) the defendant either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (citing *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996)); *Monette*, 90 F.3d at 1178. The ADA defines the term "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*. The "disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette, 90 F.3d at 1183* (emphasis in original).

Once the employee successfully makes out a *prima facie* case, a mandatory presumption of discrimination is created and the burden shifts to the employer to proffer a non-discriminatory reason for discharging the employee. *Id. at 1185*. If the employer is able to sustain its burden, then the mandatory presumption evaporates into a permissive [*35] inference, and the burden shifts back to the employee to show by a preponderance of the evidence that the employer's proffered reason for discharge was actually a pretext intended to hide unlawful discrimination. *Id. at 1186*. While the burden of production shifts back and forth between the parties under the *McDonnell Douglas* framework, the ultimate burden of proving that the employer discriminated against the employee on account of his or her disability remains at all times with the employee. *Monette, 90 F.3d at 1186--87*.

As the Sixth Circuit has repeatedly recognized "[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both. If a plaintiff can produce direct evidence of discrimination then the *McDonnell Douglas-Burdine* paradigm is of no consequence. Similarly, if a plaintiff attempts to prove its case using the *McDonnell Douglas-Burdine* paradigm, then the party is not required to introduce direct evidence of discrimination." *Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 453 (6th Cir. 2004)* (quoting *Kline v. Tenn. Valley Auth., 128 F.3d 337, 348--49 (6th Cir. 1997)*.

The present case is, in fact, the rare one [*36] in which the plaintiff can point to direct evidence of disability discrimination. Alternatively, however, the plaintiff also contends that there is at least a question of fact as to whether he can prove disability discrimination with indirect evidence.

### a. Direct Evidence of Discrimination Based on Disability

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Bhama v. Mercy Mem'l Hosp. Corp., 416 Fed. Appx. 542, 2011 WL 1086632, at *9 (6th Cir. 2011)*. Direct evidence "does not require the fact finder to draw any inferences to reach that conclusion." *Id.* Direct evidence is sufficient to defeat a motion for summary judgment in employment discrimination cases. *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 511, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)*.

In the present case, the plaintiff contends that Acting City Administrator Truell's letter provides direct evidence of disability discrimination sufficient to defeat summary judgment. In this letter, as set forth above, Truell wrote:

> I understand that you are currently receiving long term disability and that you are unable to return to perform the essential functions [*37] of your job at this time. Should you recover from your medical condition and no longer be disabled, you may wish to re-apply for employment opportunities with the City of Franklin.

*Id.* Despite the seemingly clear reason for discharging the plaintiff articulated here, the City has subsequently offered several other reasons for terminating Plaintiff. In his November 4, 2008 letter to Burress, Truell stated that Burress was being terminated for violating the City's prohibition against working while on medical leave without prior permission, but as noted above the City has since abandoned this position. Further, in its pleadings the City asserts that Burress was terminated because he had exhausted his twenty-four weeks of unpaid medical leave.

Besides the fact that an employer's shifting justifications for an adverse employment decision "calls the credibility of those justifications into question," *Cicero v. Borg-Warner Auto. Inc. 280 F.3d 579, 592 (6th Cir. 2002)*, the Court finds that Truell's letter, standing alone, is sufficient to permit a jury to conclude that Burress was terminated because of his disability, without the need for drawing any inferences. On this basis alone, the defendant's [*38] motion for summary judgment as to the ADA-discrimination claim must be denied. The Court will nonetheless also assess the plaintiff's claim of disability discrimination using indirect evidence.

### b. Indirect Evidence of Discrimination Based on Disability

The plaintiff's indirect evidence of discrimination and pretext on the part of the City is also sufficient to withstand summary judgment. The City concedes that Burress is (or was) disabled within the meaning of the ADA, but argues that he cannot establish a *prima facie* case of ADA discrimination because he was not a "qualified individual" under the Act, nor can he show that he was refused a reasonable accommodation or terminated solely because of his disability. As set forth below, the Court finds that the plaintiff has sufficient evidence to support a *prima facie* case of ADA discrimination. In addition, there is evidence in the record from which a jury could conclude that the City's proffered reason for firing Burress is pretextual.

### i. Whether Plaintiff Was a "Qualified Individual"

Under the ADA, a "qualified individual" is one who, either with or without reasonable accommodation, can perform the essential functions of the position that [*39] the individual holds or desires. *42 U.S.C. § 12111(8) (2008)*. Both parties agree that at the time of his discharge, Burress could not perform the essential functions of the position of patrol officer, the job he technically held at the time of his termination on October 6, 2008. (Def's Brief at 24; Pl.'s Resp. at 18.) The two parties, however, disagree about whether Burress could have returned to work with a reasonable accommodation, whether the plaintiff sufficiently requested an accommodation, and whether such accommodations existed at all.

The City argues that Burress was not a qualified individual because the relevant time for determining whether an employee is "otherwise qualified" for any open position is on the day of his discharge. On the day of Burress's termination, October 6, he had not yet been released by his physicians to return to work at all. On that basis, the City argues that Burress was not a qualified individual for whom it needed to consider making any accommodation.

Notwithstanding, Sixth Circuit case law establishes that providing additional unpaid leave can qualify as a reasonable accommodation. *Cehrs v. Ne. Ohio Alzheimer's Research Ctr., 155 F.3d 775, 783 (6th Cir. 1998)* [*40] (finding that a plaintiff who had already been on medical leave for eight weeks presented a genuine issue of material fact regarding whether an additional month of medical leave constituted a reasonable accommodation). In addition, as the City acknowledges, allowing an employee to return to work in a light-duty position also can qualify as a reasonable accommodation.

Thus, Burress has presented evidence from which a reasonable jury could conclude that he was a "qualified individual" in that he could have returned to work with a reasonable accommodation--namely, a few additional days of leave time and then being permitted to return to work in a light-duty position. The next question is whether the plaintiff adequately requested these accommodations and if so, whether they were reasonable and available.

**ii. Whether Plaintiff Was Refused a Reasonable Accommodation**

In ADA cases, the plaintiff bears the initial burden of requesting accommodations and showing that these accommodations are objectively reasonable before the burden of persuasion shifts to the employer to demonstrate that such accommodations would impose undue hardship. *Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 870 (6th Cir. 2007)*; [*41] *Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 457 (6th Cir. 2004)*. The ADA does, however, require both the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Lafata v. Church of Christ Home for the Aged, 325 F. App'x 416, 422 (6th Cir. 2009)* (quoting *29 C. F. R. § 1630.2(o)(3)*); *see also Kleiber, 485 F.3d at 871* ("Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith."). Employers who fail to engage in this interactive process in good faith face liability under the ADA if reasonable accommodations would have been possible. *Lafata, 325 F. App'x at 422* (citing *Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir.)* (en banc), *vacated on other grounds*, *535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002)*).

Although employees must initiate this discussion process, the ADA does not require employees to "use the magic words 'accommodation' or even 'disability.'" *Leeds v. Potter, 249 F. App'x 442, 449*. Simply asking for continued employment can be a sufficient [*42] request for an accommodation. *Burns v. Coca-Cola Enters., Inc., 222 F.3d 247, 257 (6th Cir. 2000)*. Taken in the light most favorable to the non-movant, Burress's September 2008 conversation with HR Director Shannon explaining that he planned to return to work around October 16 but would require a light-duty position for a period of time satisfied the requirement that he request an accommodation - a short period of additional leave time and then being permitted to work in a light-duty position. This request also triggered the City's obligation to engage in a good-faith discussion of possible accommodations. The question then shifts to whether any reasonable accommodation was available.

The City argues that providing additional leave time would not have been reasonable in this case because, first, it had already provided Burress with twenty-four weeks of unpaid leave, more than the amount to which he was entitled under City policy. And second, any such additional leave would have been of indefinite duration, because there were no light-duty positions available that the plaintiff could have performed. *Cf. Walsh v. United Parcel Serv., 201 F.3d 718, 727 (6th Cir. 2000)* (noting that where [*43] an employer has already provided substantial leave, significant additional leave with no clear prospect of recovery is not a reasonable accommodation as it would impose undue hardship on the employer). In short, the City argues that the reasonableness of providing additional leave time is a moot point because even if Burress were qualified to work in a light-duty position, no such positions were available.

In that regard, the City points specifically to the testimony of Acting City Administrator Truell that Burress's former light-duty position had been eliminated because of budget cuts. On that basis, the defendant asserts that the only possible accommodation for Burress would have been unpaid leave for at least an additional twelve months when the plaintiff could return to his full duties as a patrol officer--a lengthy and uncertain duration of leave comparable to the one the court in *Walsh* found to be "objectively unreasonable." *Walsh, 201 F.3d at 727*.

In response Burress points out that at the time of his termination, the position he had held prior to taking leave was in fact still open and that other members of the police force were being forced to do the work. More critically, Burress [*44] also alleges that there were openings for the position of communication officer, the job he had held before becoming a patrol officer and for which he was wholly qualified. As set forth above, the City argues that Burress's temporary restrictions prevented him from being able to work as a communications officer: Specifically, the City contends that the job description of communications officer included the ability to lift twenty to forty pounds, and it also required working in a small room with a number of other officers. Burress's surgeon, Dr. Kelly, had indicated that he should not lift more than twenty pounds until after November 12, 2008 (three months post-transplant), or be confined in a small, poorly ventilated area with a large number of people for an indefinite period of time. In response, Burress counters this assertion by pointing out that (1) those restrictions were temporary and were going to be lifted soon; (2) the confinement restriction was not applicable in this instance anyway, and in any event the City never engaged in any inquiry to determine whether and to what extent the restriction would have applied; and (3) the lifting requirement set forth in the job description [*45] was not accurate. In support of this latter assertion, Burress has introduced evidence from Janet Wohler--who had served as a communications officer for eleven years--that she had never been required to lift more than a few pounds and certainly never weights of twenty to forty pounds. In addition, Burress himself has testified that he never lifted twenty or more pounds when he was working as a communications officer. Perhaps most damningly, the City's own advertisement for the position made no mention of such a lifting requirement.

The City argues that Burress's own experience as a dispatcher and those of long-time communications officer Janet Wohler are not determinative of the essential functions of the position, and continues to maintain that the ability to lift twenty to forty pounds is an essential function of the position. Nonetheless, in light of the evidence presented by both parties, the Court can only conclude that there is a genuine issue of material fact for the jury to resolve regarding whether granting additional leave time would have posed an undue burden on the City, and as to whether a light-duty position was available and if so whether Burress had the ability to perform [*46] the essential functions thereof. Consequently, for purposes of summary judgment, Burress has presented sufficient evidence to establish a *prima facie* claim of ADA discrimination.

### iii. Whether Plaintiff Can Show Pretext

The defendant does not specifically address the question of pretext in its memorandum in support of its motion for summary judgment, but then argues in its reply brief that the plaintiff, in his response, failed to establish that the City's proffered reason for its action was pretextual. Regardless, in the context of arguing that the plaintiff cannot show he was terminated "solely" because of his disability, the City argued in its original brief that it has shown the plaintiff was "at least in part, terminated without regard to his disability because he had used twenty-four weeks of unpaid leave." (Truell Dep. 13--16 and Ex. 19.)

A plaintiff can demonstrate pretext by showing that the defendant's proffered reason for its adverse employment action (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action. *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)*. The Sixth Circuit [*47] has recently cautioned, however, that courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)*. Pretext, the court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* Thus, the *Manzer* test can be distilled to one simple requirement: The plaintiff must produce sufficient evidence that a reasonable jury could doubt the defendant's stated reasons for its actions. *Id.*

Here, the plaintiff has presented evidence sufficient to call into question the defendant's stated reason for its actions. First, as discussed above in the context of addressing the plaintiff's direct evidence of discrimination, Truell's letter effectively states that the plaintiff was being discharged because he was disabled from performing the essential functions of the position of patrol officer. The evidence is clear that the City did not engage in a discussion with Burress about how much longer he would need [*48] to be off or what types of restrictions he would have upon returning to work. Nor did the City perform any investigation to determine whether there were light-duty positions available the plaintiff could

have performed while continuing to recuperate. Further, as noted above, the City has changed course several times in explaining its decision to discharge Burress. Again, an employer's shifting justifications for an adverse employment decision "calls the credibility of those justifications into question." *Cicero v. Borg-Warner Auto. Inc. 280 F.3d 579, 592 (6th Cir. 2002).*

In sum, the evidence is sufficient for a jury reasonably to conclude based on indirect evidence that the City violated the ADA. The City's motion for summary judgment as to Burress's ADA discrimination claim must therefore be denied on this basis as well.

**2. ADA Retaliation Claim**

To present a *prima facie* case of retaliation under the ADA, the plaintiff must establish that: (1) he was engaged in a protected activity, (2) the exercise of his civil rights was known to the defendant, (3) the defendant subsequently took adverse employment action, and (4) a causal connection exists between the protected activity and the adverse [*49] employment action--in this case the plaintiff's termination. *Walborn v. Erie Cnty. Care Facility, 150 F.3d 584, 588--89 (6th Cir. 1998).* Once the plaintiff has established a *prima facie* retaliation claim, the defendant has the burden to "prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Sowards v. Loudon Cnty., 203 F.3d 426, 431 (6th Cir. 2000).* If the defendant does so, then the plaintiff must "show that the proffered reason was not its true reason but merely a pretext for retaliation" by demonstrating that defendant's proffered reason: (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action. *Harris v. Metro Gov't of Nashville & Davidson Cnty., 594 F.3d 476, 486 (6th Cir. 2010)* (citing *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).* "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion throughout the process." *Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007)* (citation omitted).

The Sixth Circuit has accepted that "the showing of a good-faith request [*50] for reasonable accommodations" is a "protected act" for purposes of an ADA retaliation claim. *Baker v. Windsor Republic Doors, 414 F. App'x 764, 776--77 & n.8 (6th Cir. 2011).* As set forth above, the Court has found that Burress's act of notifying the City in September 2008 that he needed a few additional weeks of leave time before returning to work, and that he needed light-duty work for a period of time after returning to work, constituted a good-faith request for an accommodation. There is no dispute that the City, through the HR Director at least, knew about this request, and that Burress's employment was subsequently terminated.

The City asserts, however, that Burress cannot establish a *prima facie* case of retaliation because he "cannot establish a causal connection between his request for additional accommodation and his termination." (ECF No. 53, at 34.) In that regard, while the City asserts that under Sixth Circuit case law temporal proximity between the protected activity and the adverse employment action is not inherently sufficient to provide this causal connection, the case law does not support the City's position that such proximity can *never* establish a causal connection. [*51] Rather, the Sixth Circuit has "embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004)*; *see also Asmo v. Keane, Inc., 471 F.3d 588, 593 (6th Cir. 2006).* As Burress's termination on October 6, 2008 occurred at most a few weeks after his request for a modified-duty position in September 2008, [6] this temporal proximity is sufficiently acute to permit an inference of a causal connection; thus, the plaintiff has presented a genuine issue of material fact for every element of his *prima facie* case of ADA retaliation.

> 6   The record does not reflect exactly when in September Burress held his meeting with HR Director Harmon, but based on the plaintiff's version of events it appears it may have occurred around the time of Burress's appointment with Dr. Kelly on September 25, 2008, since Burress recalls referring to his upcoming appointment with Dr. Kelly on October 16.

The City argues in the alternative that it is entitled to summary [*52] judgment on this claim because Burress cannot rebut its proffered reason for terminating him: that Burress had exhausted all his unpaid leave time. The Court finds, largely for the same reasons as discussed above in the context of the discussion of the plaintiff's ADA discrimination claim, that there is sufficient evidence in the record to permit a reasonable jury to find that the defendant's proffered reason for its action is pretextual. As Burress points out, he had exceeded his allotted unpaid medical leave by six weeks already at the time of his termination, but the City did not discharge him until shortly after he requested a light-duty position. Burress also points to the fact that the City has not consistently articulated the same reasoning for why it terminated Burress. Finally, while the defendant's reply brief notes that other City employees have been terminated for exhausting their allotted leave time, the plaintiff's sur-

reply counters that the individuals fired predate current HR Director Harmon's tenure, that the City cannot say whether those individuals asked for accommodations to return to work, and even if they did, their specific circumstances would not necessarily [*53] be comparable to Burress's because assessing whether a disabled person is otherwise qualified for a position is a highly individualized and fact-specific inquiry. (Def.'s Reply at 4; Pl.'s Surreply at 2--3.).

Although the City presents persuasive arguments and evidence to bolster its claim that Burress's termination was not retaliatory and that its motivations to terminate him were not pretextual, these arguments are factual in nature. The Court finds that a genuine issue of material fact regarding Plaintiff's ADA retaliation claim remains and this claim therefore survives summary judgment.

**C. TDA Claims**

Generally speaking, discrimination claims under the Tennessee Disability Act, *Tenn. Code Ann. § 8-50-103, et seq.* are comparable to ADA claims, and courts may evaluate them using federal cases interpreting the ADA for guidance. *Barnes v. Goodyear Tire and Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000).* [7] The TDA is not identical to the ADA, however. The TDA prohibits discrimination in hiring and firing based solely on any physical, mental, or visual handicap unless that handicap prevents the applicant/employee from performing the duties required by the employment sought or held. *Tenn. Code Ann. § 8-50-103(a).* [*54] The language of the TDA differs from that of the ADA insofar as the former does not contain a "reasonable accommodation" element. In fact, the Tennessee Court of Appeals has repeatedly noted, albeit in unpublished opinions, that the Tennessee Code is silent regarding any obligation on the part of any employer to provide a reasonable accommodation and has therefore held that employers are not required to do so under the TDA. *See, e.g., Anderson v. Ajax Turner Co.,* No. 01A01-9807-CH-00396, 1999 Tenn. App. LEXIS 728, 1999 WL 976517, at *4 (Tenn. Ct. App. Oct. 28, 1999); *Pruett v. Wal-Mart Stores, Inc.,* No. 02A01-9610-CH-00266, 1997 Tenn. App. LEXIS 842, 1997 WL 729260, at *13 (Tenn. Ct. App. Nov. 25, 1997); *Turner v. Eagle Distributing Co.,* No. 03A01-9209-CH-00338, 1993 Tenn. App. LEXIS 252, 1993 WL 88365, at *2 (Tenn. Ct. App. Mar. 29, 1993). The Tennessee Attorney General is in accord. *Cf. 94 Op. Tenn. Att'y Gen. 024, 1994 Tenn. AG LEXIS 24 (Mar. 10, 2004)* ("The Tennessee Human Rights Commission should not require reasonable accommodation of a handicapped employee under current state law in light of various court opinions holding that the state statute does not require accommodation."). This Court concludes based on the wording of the statute, the Court of Appeals [*55] cases construing it, and the Tennessee Attorney General's interpretation of state law, that the TDA does not include a reasonable-accommodation component. [8]

> 7 *Barnes* has been abrogated by *Gossett v. Tractor Supply Co., 320 S.W.3d 777 (Tenn. 2010)*, which held that the *McDonnell-Douglas* burden-shifting analysis is not applicable at the summary judgment stage "because it is incompatible with Tennessee summary judgment jurisprudence." *Id.* at 779; *see also id.* at 782 (reviewing the continued viability of the *McDonnell-Douglas* standard in light of *Hannan v. Alltel Publishing Co., 270 S.W.3d 1 (Tenn. 2008)* (redefining Tennessee's summary judgment standard)). The Court presumes without deciding that the Tennessee standard of review of summary judgment motions is procedural rather than substantive and does not bind this Court, even in diversity cases. In addition, the rejection of the *McDonnell-Douglas* has no effect here as the Court will not apply the burden-shifting analysis to the plaintiff's TDA claim. (The Court notes further complication in this arena since the Tennessee General Assembly has legislatively overruled both *Gossett* and *Hannan*, but the new statutes only apply to cases filed [*56] on or after June 10, 2011 and July 1, 2011, respectively. *See Tenn. Code Ann. § 4-21-311(e), 50-1-304(g)* (setting forth burden of proof in discrimination cases); Tenn. SB 1114/HB 158 (to be codified at *Tenn. Code Ann. § 20-16-101*), setting forth new summary judgment standard).)
>
> 8 The Court acknowledges a disagreement within this district as to whether the TDA does or does not encompass an accommodation requirement. In *Roberson v. Cendant Travel Servs., Inc., 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002)* (Wiseman, J.), the undersigned noted without discussion that the TDA "elements are very similar to those of the ADA, but do not include a 'reasonable accommodation' component." That ruling was followed in *Hall v. Wal-Mart Stores East, L.P., 637 F. Supp. 2d 588, 603 (M.D. Tenn. 2009)* (Haynes, J.) ("As a matter of law, an employer is not required to provide a reasonable accommodation under the THA."), and *Melman v. Metropolitan Government of Nashville & Davidson County,* No. 3:08-cv-01205, 2009 U.S. Dist. LEXIS 58712, 2009 WL 2027120, *4 (M.D. Tenn. Jul 09, 2009) (Haynes, J.) (same). In *Adams v. TRW Automotive U.S. LLC,* No. 3:03-1240, 2005 U.S. Dist. LEXIS 39636, 2005 WL 1862302 (M.D. Tenn. July 22, 2005) (Trauger, J.), Judge Trauger

specifically [*57] noted that the question of whether a person to be deemed a "qualified individual" must demonstrate that he can perform the essential functions of the desired position "with or without a reasonable accommodation" was not squarely before the Tennessee Supreme Court in *Barnes* because the employer conceded that the employee was qualified for the position, and the plaintiff in *Barnes* did not request an accommodation or claim that he needed one. By contrast, the court noted that the Tennessee Court of Appeals, when squarely presented with the question, has repeatedly held that the state statute does not include an accommodation requirement. Judge Trauger also noted that the Tennessee Attorney General has similarly interpreted the TDA. *2005 U.S. Dist. LEXIS 39636, [WL] at \*20* (citing *1994 Tenn. AG LEXIS 24*). Judge Trauger therefore concluded that "this interpretation is the most appropriate reading of Tennessee state law from all of the available sources that have addressed the question of whether a claim for failure to accommodate exists." *Id.*

However, in *Davis v. Ford Motor Credit Co.*, No. 3:04-0790, 2005 WL 2452601 (M.D. Tenn. Oct. 3, 2005) (Echols, J.), issued several months after *Adams*, Judge Echols, without citing [*58] *Adams*, came to a different conclusion. The court recognized that other courts, including the Tennessee Court of Appeals and the Sixth Circuit, had all held that the Tennessee statute did not contain a requirement that the employer reasonably accommodate the disabilities of an employee. The court observed, however, that the Tennessee Supreme Court in *Barnes* had stated that the ADA provided the appropriate framework for analyzing claims under the THRA and the TDA (then called the Tennessee Handicap Act or THA), and held that, to make out a *prima facie* case of discrimination, a claimant must first "establish that he or she is a qualified individual with a disability. Next, the claimant must show that he or she can perform the essential functions of the job *with or without reasonable accommodation*. Finally, the claimant must show that he or she was subjected to an adverse employment action on the basis of the protected disability." *Id.* at \*7. The *Davis* court rejected the defendant's argument that the *Barnes* court's reference to accommodations was dictum and therefore not controlling, on the basis that *Erie* diversity jurisdiction was invoked so the law of the state as pronounced by the [*59] highest state court was binding. *Id.* (citing *Erie RR. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*. Cf. *Calandriello v. Tenn. Processing Ctr., LLC*, No. 3:08-1099, *2009 U.S. Dist. LEXIS 116613, 2009 WL 5170193 (M.D. Tenn. Dec. 15, 2009)* (Echols, J.) (same, relying on *Davis*).

Consequently, to the extent the plaintiff's TDA discrimination claim is premised upon the defendant's failure to provide a reasonable accommodation, that claim must fail. To the extent the claim is premised on the question of whether the plaintiff was terminated solely because of his disability, the motion for summary judgment will be denied.

However, because the plaintiff's TDA retaliation claim is premised entirely upon his having requested a reasonable accommodation, it appears the claim must fail. As Tennessee law does not require employers to make a reasonable accommodation, it follows that requesting an accommodation is not protected activity. The Court will therefore grant summary judgment for the defendant as to the plaintiff's TDA retaliation claim.

### D. Plaintiff's Post-Termination Retaliation Claims

The plaintiff's Second Amended Complaint contains a separate retaliation claim brought under the FMLA, the ADA, the TDA, Title VII, and the THRA. [*60] The plaintiff asserts that he was retaliated against within the meaning of each of these statutes when the City withdrew its offer to reinstate him after he had been discharged after he filed the present lawsuit asserting claims under each of those statutory schemes. In other words, the withdrawal of the offer to reinstate is the "adverse employment action" element of each retaliation claim, and the protected activity with respect to this claim is the filing of the lawsuit, which occurred a few weeks after the offer to reinstate was extended, and a few weeks prior to the withdrawal of the offer to reinstate.

The City asserts that it is entitled to summary judgment on all of this post-termination retaliation claim, regardless of which statute is invoked, because its subsequently withdrawn offer to reinstate Plaintiff was made during settlement negotiations. Under the City's reading of *Rule 408 of the Federal Rules of Evidence*, the evidence of the offer to reinstate is inadmissible because it was made during the course of settlement negotiations. The plaintiff counters that the defendant misapplies *Rule 408* because under that rule, offers to settle or compromise a claim are inadmissible [*61] only when used to prove the validity or invalidity of the claim that was *the subject of the compromise*. The plaintiff argues that the fact that the City made and revoked an offer of reinstatement is admissible to show that the defendant revoked the offer in retaliation for the plaintiff's engaging in protected activity, *i.e.*, filing this lawsuit. (Pl.'s Resp. at 15--16.)

*Rule 408* in its entirety reads as follows:

> *Rule 408*. Compromise and Offers to Compromise
>
> (a) Prohibited uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.
>
> (b) Permitted uses. This [*62] rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

*Fed. R. Evid. 408*. On its face, *Rule 408* "'only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim.'" *Uforma/Shelby Bus. Forms, Inc. v. NLRB, 111 F.3d 1284, 1293--94 (6th Cir. 1997)* (quoting 23 Charles Alan Wright and Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5314 n.25 (1st ed. 1980)); *accord Carney v. Am. Univ., 151 F.3d 1090, 1095, 331 U.S. App. D.C. 416 (D.C. Cir. 1998)* (holding that settlement letters "can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)"); *Scott v. Goodman, 961 F. Supp. 424, 437 (E.D.N.Y. 1997)* ("*Rule 408* is inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions.").

Despite the defendant's attempt to [*63] hide behind *Rule 408*, *Uforma* is on point and controlling here. *Rule 408* is simply not applicable when the claim at issue arises out of wrongful conduct allegedly committed over the course of a settlement discussion. Because the plaintiff does not seek to use the reinstatement offer (and withdrawal thereof) as evidence of the validity or invalidity of the discrimination or retaliation claims that were the subject of the settlement discussions, *Rule 408* does not come into play. In short, evidence of the reinstatement offer and discussions centered around that offer (for instance, the attempts to persuade Dr. Gale to change his assessment) is admissible to prove retaliation based on the withdrawal of the offer.

The defendant's Reply also argues that the plaintiff cannot prove a causal connection between the filing of his initial complaint and the defendant's withdrawal of his reinstatement offer. Again, the very close proximity in time in this particular case is sufficient to give rise to an inference of causation that will defeat summary judgment.

The motion for summary judgment as to the post-termination claim will therefore be denied.

## V. CONCLUSION

As Burress has either opted to concede [*64] or to rest on his pleadings without providing any probative evidence regarding his discrimination claims under the FMLA, THRA, Title VII, and *§ 1983*, as well as his claim of retaliatory discharge for filing a working compensation and his due-process claim under *§ 1983*, the Court finds that there is no genuine issue of material fact pertaining to any of these claims and will therefore grant summary judgment in the City's favor regarding each of these claims.

Burress, however, has produced enough probative evidence to generate genuine issues of material fact regarding his discrimination and retaliation claims under the ADA, his TDA discrimination claim, and the post-termination retaliation claim (under any of the enumerated statutes). Because reasonable factfinders could rule in Plaintiff's favor, the Court must deny summary judgment regarding these claims.

The City of Franklin's motion for summary judgment will be granted in part and denied in part as indicated herein. An appropriate Order will enter.

/s/ Thomas A. Wiseman, Jr.

Thomas A. Wiseman, Jr.

Senior U.S. District Judge

**JURY DEMAND**

**ORDER**

In this action, Plaintiff Harold Dwayne Burress asserts claims under the Family Medical Leave Act [*65] ("FLMA"), *29 U.S.C. § 2601, et seq.*, the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101, et seq.* ("ADA"), Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), *42 U.S.C. §2000e, et seq.*, and under *42 U.S.C. § 1983* ("*§ 1983*") for violation of his equal-protection and due-process rights; the plaintiff also asserts state-law claims under the Tennessee Disability Act ("TDA"), *Tenn. Code Ann. § 8-50-103*, the Tennessee Human Rights Act ("THRA"), *Tenn. Code Ann. §4-21-101, et seq.*, and Tennessee common law. (ECF No. 25.) Now before the Court is defendant City of Franklin's Motion for Summary Judgment (ECF No. 33), in which the City asserts that it is entitled to judgment as a matter of law in its favor regarding Burress's claims against it. This motion has been fully briefed and is ripe for consideration.

For the reasons explained in the accompanying Memorandum Opinion, the defendant's motion is **GRANTED IN PART AND DENIED IN PART**, as follows: The Court finds that material issues of disputed fact preclude summary judgment on the plaintiff's ADA discrimination and retaliation claims, the TDA discrimination claim, and the post-termination retaliation claims. Summary [*66] judgment as to those claims is therefore **DENIED**. However, because Burress has either opted to concede or to rest on his pleadings without producing any probative evidence regarding his discrimination claims under the FMLA, THRA, Title VII, and *§ 1983*, as well as his claim of retaliatory discharge for filing a working compensation and his due-process claim under *§ 1983*, the Court finds that there are no genuine issues of material fact pertaining to any of these claims. The City's motion for summary judgment as to those claims is therefore **GRANTED**, and those claims are **DISMISSED**.

It is so **ORDERED**.

This matter remains scheduled for trial to begin October 11, 2011.

/s/ Thomas A. Wiseman, Jr.

Thomas A. Wiseman, Jr.

Senior U.S. District Judge